LENNON, MURPHY & LENNON LLC
Attorneys for Plaintiff
Kevin J. Lennon
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, NY 10170
(212) 490-6050 - phone
(212) 490-6070 - facsimile



08 CV 01292

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
FAR EASTERN SHIPPING CO., PLC,           :     08 Civ. _____ ( )
                                          :
                Plaintiff,                :     ECF CASE
                                          :
        - against -                       :
                                          :
MINERMET S.A.,                            :
                                          :
                Defendant.                :
------------------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiff, FAR EASTERN SHIPPING CO., PLC (hereinafter "FESCO" or "Plaintiff") by and through their attorneys, Lennon Murphy & Lennon, LLC, as and for their Verified Complaint against the Defendant, MINERMET S.A.. (hereinafter "MINERMET" or "Defendant"), alleges, upon information and belief, as follows:

1.   This is an admiralty and maritime claim within the meaning of Federal Rule of Civil Procedure 9(h) and 28 United States Code § 1333. Jurisdiction over this matter is also present pursuant this Court's federal question jurisdiction, 28 United States Code § 1331.

2.   Venue is properly situated in this Honorable Court's district pursuant to 28 United States Code § 1391 and the General Maritime Law of the United States.

3. Upon information and belief, Defendant MINERMET was, and still is, a foreign corporation or other business entity organized under and existing by virtue of foreign law, with a place of business in Lausanne, Switzerland.

4. By a charter party dated July 23, 2003 FESCO chartered the Vessel VASSILYI BURKHANOV to MINERMET. *See copy of charter party attached hereto as Exhibit "1."*

5. During the course of the aforesaid charters, certain disputes arose between the parties regarding Defendant's failure to remit freight due and owing under the charter party.

6. As a result of Defendant's breach of the charter party, FESCO has sustained damages in the total principal amount of $12,520.00, exclusive of accumulated interest[1], arbitration costs and attorneys fees.

7. The aforesaid charter party provides at Rider Clause 28 that disputes will be settled in London arbitration with English law to apply. FESCO is preparing to commence arbitration against MINERMET and reserves its rights to arbitrate the dispute.

8. Interest, costs and attorneys' fees are routinely awarded to the prevailing party in proceedings governed by English law. As best as can now be estimated, Plaintiff expects to recover the following amounts:

| | | |
|---|---|---|
| A. | On the principal claim: | $13,612.43; |
| B. | 2 years of interest at 8% per annum: | $2,356.91; and |
| C. | Legal costs and fees: | $12,500. |
| **Total:** | | **$28,469.34.** |

9. Upon information and belief and following a good faith investigation, Plaintiff avers that the Defendant cannot be found within this District within the meaning of

---

[1] MINERMET's outstanding unpaid debt has been subject to a 2% monthly interest charge as per FESCO's invoice. The accumulated interest at 2% per month is presently $1,092.43.

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant.

10. The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendant held by any garnishee(s) within the District for the purpose of obtaining personal jurisdiction over the Defendant, and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A. That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint, failing which default judgment be entered against it in the sum of $28,469.34;.

B. That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of **$28,469.34** belonging to, due or being transferred to, from, or for the benefit of the Defendant, including, but not limited to, such property as may be held, received or transferred in Defendant's name, or as may be held,

received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishes to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

    C.    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

    D.    That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

    E.    That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

Dated: Southport, CT
         February 8, 2008

                                    The Plaintiff,
                                    FAR EASTERN SHIPPING CO., PLC

                                    By: _____
                                        Kevin J. Lennon

                                  LENNON, MURPHY & LENNON, LLC
                                  The Gray Bar Building
                                  420 Lexington Ave., Suite 300
                                  New York, NY 10170
                                  Phone (212) 490-6050
                                  Fax (212) 490-6070
                                  kjl@lenmur.com

## ATTORNEY'S VERIFICATION

State of Connecticut  )
                      )  ss.:  Town of Southport
County of Fairfield   )

1. My name is Kevin J. Lennon.

2. I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3. I am a partner in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the Plaintiff.

4. I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5. The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6. The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7. I am authorized to make this Verification on behalf of the Plaintiff.

Dated:   Southport, CT
         February 8, 2008

                                    _____
                                    Kevin J. Lennon

EXHIBIT 1

13/08  03 MI  13:44 FAX 49 40 37869550      ORCA TRANSPORT AGENCY

| 1. Shipbroker | RECOMMENDED |
|---|---|
| ORCA Transport Agency GmbH<br>Neuer Wall 61<br>20354 Hamburg | THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE<br>UNIFORM GENERAL CHARTER (AS REVISED 1922 and 1976)<br>INCLUDING "F.I.O." ALTERNATIVE, ETC.<br>(To be used for trades for which no approved form is in force)<br>CODE NAME: "GENCON" |
| | 2. Place and date<br>Hamburg, 23rd July 2003 (21) |
| 3. Owners/Place of business (Cl. 1)<br>Far Eastern Shipping Co.<br>Vladivostok | 4. Charterers/Place of business (Cl. 1)<br>Minermet S.A.<br>Avenue Mon-Repos 14<br>CH-1005 Lausanne |
| 5. Vessel's name (Cl. 1)<br>M/V VASILIY BURKHANOV | 6. GRT/NRT (Cl. 1)<br>18627/7669 |
| 7. Deadweight cargo carrying capacity in tons (abt) (Cl. 1)<br>DWAT 22910 | 8. Present position (Cl. 1)<br>trading |
| 9. Expected ready to load (abt.) (Cl. 1)<br>16-20/08/2003 | |
| 10. Loading port or place (Cl. 1)<br>DALIAN 1gsb aaaa | 11. Discharging port or place (Cl. 1)<br>MERSIN 1 gsb aaaa<br>+ 1gsp Marmara 1gsb aaaa in Charterers' opti |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1)<br>15.000 MT in Charterers' option upto full cargo capacity on permissible draft<br>bagged rice in 50kilo bags stowing abt 52' wog<br>as sole cargo | |
| 13. Freight rate (also state if payable on delivered or intaken quantity) (Cl. 1)<br>USD 596.000 lumpsum basis 1/1<br>USD 626.000 lumpsum basis 1/2<br>with D/A Owners' account | 14. Freight payment (state currency and method of payment; also beneficiary and bank account)<br>See Clause 31 |
| 15. Loading and discharging costs (state alternative (a) or (b) of Cl. 5; also indicate if vessel is gearless)<br>FIOS L/S/D | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only)<br>a) Laytime for loading<br>See Clause 23<br>b) Laytime for discharging<br>See Clause 23<br>c) Total laytime for loading and discharging<br>-- |
| 17. Shippers (state name and address) (Cl. 6) | |
| 18. Demurrage rate (loading and discharging) (Cl. 7)<br>USD 6000 pdpr/dhdwts be | 19. Cancelling date (Cl. 10)<br>20th August 2003 |
| 20. Brokerage commission and to whom payable (Cl. 14)<br>3% address commission plus 1,00% to ORCA Hamburg | |
| 21. Additional clauses covering special provisions, if agreed.<br>Vessel's description at Rider to the CP, Additional Clauses 18-45, both included, as attached herewith to form part of this Charter party and to apply. | |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

## PART II

### "Gencon" Charter (As Revised 1922 and 1976)

Including "F.I.O." Alternative, etc.

1. It is agreed between the party mentioned in Box 3 as Owners of the steamer or motor-vessel named in Box 5, of the gross/nett Register tons indicated in Box 6 and carrying about the number of tons of deadweight cargo stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter about the date indicated in Box 9, and the party mentioned as Charterers in Box 4 and their
The said vessel shall proceed to the loading port or place stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at Charterers' risk) as stated in Box 12 (Charterers to provide all mats and/or wood for dunnage and any separations required, the Owners allowing the use of any dunnage wood on board if required), which the Charterers bind themselves to ship, and being so loaded the vessel shall proceed to the discharging port or place stated in Box 11 as ordered on signing Bills of Lading or so near thereto as she may safely get and lie always afloat and there deliver the cargo on being paid freight on delivered or intaken quantity as indicated in Box 13, at the rate stated in Box 13. [having] Stowage to be done under Master's direction. [Lumpsum]

2. **Owners' Responsibility Clause**
Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by the improper or negligent stowage of the goods (unless stowage performed by shippers/Charterers or their stevedores or servants) or by personal want of due diligence on the part of the Owners or their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by the personal act or default of the Owners or their Manager.
And the Owners are responsible for no loss or damage or delay arising from any other cause whatsoever, even from the neglect or default of the Captain or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this clause, be responsible, or from unseaworthiness of the vessel on loading or commencement of the voyage or at any time whatsoever. Damage caused by contact with or leakage, smell or evaporation from other goods or by the inflammable or explosive nature or insufficient package of other goods not to be considered as caused by improper or negligent stowage, even if in fact so caused.

3. **Deviation Clause**
The vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist vessels in all situations, and also to deviate for the purpose of saving life and/or property.

4. **Payment of Freight** See Clause 31
The freight to be paid in the manner prescribed in Box 14 in cash without discount on delivery of the cargo at mean rate of exchange ruling on day or days of payment, the receivers of the cargo being bound to pay freight on account during delivery, if required by Captain or Owners.
Cash for vessel's ordinary disbursements at port of loading to be advanced by Charterers if required at highest current rate of exchange, subject to two per cent. to cover insurance and other expenses.

5. **Loading/Discharging Costs**
*(a) Gross Terms* See Clause 23
The cargo to be brought alongside in such a manner as to enable vessel to take the goods with her own tackle. Charterers to procure and pay the necessary men on shore or on board the lighters to do the work there, vessel only heaving the cargo on board.
If the loading takes place by elevator, cargo to be put free in vessel's holds, Owners only paying trimming expenses.
Any pieces and/or packages of cargo over two tons weight, shall be loaded, stowed and discharged by Charterers at their risk and expense. The cargo to be received by Merchants at their risk and expense alongside the vessel not beyond the reach of her tackle.
*(b) F.I.O. and free stowed/trimmed*
The cargo shall be brought into the holds, loaded, stowed and/or trimmed and taken from the holds and discharged by the Charterers or their Agents, free of any risk, liability and expense whatsoever to the Owners.
The Owners shall provide winches, motive power and winchmen from the Crew if requested and permitted; if not, the Charterers shall provide and pay for winchmen from shore and/or cranes, if any. (This provision shall not apply if vessel is gearless and stated as such in Box 15).
* Indicate alternative (a) or (b), as agreed, in Box 15.

6. **Laytime** See Clause 19
*(a) Separate laytime for loading and discharging*
The cargo shall be loaded within the number of running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count. The cargo shall be discharged within the number of running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.
*(b) Total laytime for loading and discharging*
The cargo shall be loaded and discharged within the number of total running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.
*(c) Commencement of laytime (loading and discharging)*
Laytime for loading and discharging shall commence at 1 p.m. if notice of readiness is given before noon, and at 6 a.m. next working day if notice given during office hours after noon. Notice at loading port to be given to the Shippers named in Box 17.
Time actually used before commencement of laytime shall count.
Time lost in waiting for berth to count as loading or discharging time, as the case may be. [Laytime]
* Indicate alternative (a) or (b) as agreed, in Box 16.

7. **Demurrage**
Ten running days on Demurrage at the rate stated in Box 12 per day or pro rata for any part of a day, payable day by day, to be allowed Merchants altogether at ports of loading and discharging.

8. **Lien Clause**
Owners shall have a lien on the cargo for freight, dead-freight, demurrage and damages for detention. Charterers shall remain responsible for dead-freight and demurrage (including damages for detention), incurred at port of loading. Charterers shall also remain responsible for freight and demurrage (including damages for detention) incurred at port of discharge, but only to such extent as Owners have been unable to obtain payment thereof by exercising the lien on the cargo.

9. **Bills of Lading**
The Captain to sign Bills of Lading at such rate of freight as presented without prejudice to this Charterparty, but should freight by Bills of Lading amount to less than the total chartered freight the difference to be paid to the Captain in cash on signing Bills of Lading.

10. **Cancelling Clause**
Should the vessel not be ready to load (whether in berth or not) on or before the date indicated in Box 19, Charterers have the option of cancelling this contract, such option to be declared, if demanded, at least 48 hours before vessel's expected arrival at port of loading. Should the vessel be delayed on account of average or otherwise, Charterers to be informed as soon as possible, and if the vessel is delayed for more than 10 days after the day she is stated to be expected ready to load, Charterers have the option of cancelling contract, unless a cancelling date has been agreed upon. [in London]

11. **General Average**
General average to be settled according to York-Antwerp Rules 1974. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see clause 2).

12. **Indemnity**
Indemnity for non-performance of this Charterparty, proved damages not exceeding estimated amount of freight. See Clause 27

13. **Agency**
In every case the Owners shall appoint his own Broker or Agent both at the port of loading and the port of discharge. [and demurrage]

14. **Brokerage**
A brokerage commission at the rate stated in Box 20 on the freight earned is due to the party mentioned in Box 20.
In case of non-execution at least 1/3 of the brokerage on the estimated amount of freight and dead-freight to be paid by the Owners to the Brokers as indemnity for the latter's expenses and work. In case of more voyages the amount of indemnity to be mutually agreed.

15. **GENERAL STRIKE CLAUSE**
Neither Charterers nor Owners shall be responsible for the consequences of any strikes or lock-outs preventing or delaying fulfilment of any obligations under this contract.
If there is a strike or lock-out affecting the loading of the cargo on arrival of it, when vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading after her arrival there, Captain or Owners may ask Charterers to declare that they agree to reckon the laydays as if there were no strike or lock-out. Unless Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, Owners shall have the option of cancelling this contract. If part cargo has already been loaded, Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.
If there is a strike or lock-out affecting the discharge of the cargo on or after vessel's arrival at or off port of discharge and same has not been settled within 48 hours, Receivers shall have the option of keeping vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging, or of ordering the vessel to a safe port where she can safely discharge without risk of being detained by strikes or lockouts. Such orders to be given within 48 hours after Captain or Owners have given notice to Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charterparty and of the Bill of Lading shall apply and vessel shall receive the same freight as if she had discharged at original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

16. **War Risks ("Voywar 1950")**
(1) In these clauses "War Risks" shall include any blockade or any action which is announced as blockade by any Government or by any belligerent or by any organized body, sabotage, piracy, and any act or threatened war, hostilities, warlike operations, civil war, civil commotion, or revolution.
(2) If at any time before the Vessel commences loading, it appears that performance of the contract will subject the Vessel or her Master or crew or her cargo to war risks at any stage of the adventure, the Owners shall be entitled by letter or telegram despatched to the Charterers, to cancel this Charter.
(3) The Master shall not be required to load cargo or to continue loading or to proceed on or to sign Bills of Lading for any adventure on which or any port at which it appears that the Vessel, her Master and crew or her cargo will be subjected to war risks. In the event the exercise by the Master of his right under this Clause after part or full cargo has been loaded, the Master shall be at liberty either to discharge such cargo at the loading port or to proceed therewith. In the latter case the Vessel shall have liberty to carry any other cargo for Owners' benefit, and accordingly to proceed to and load discharge such other cargo at any other port or ports whatsoever, backwards or forwards, although in a contrary direction to or out of or beyond the ordinary route. In the event of the Master electing to proceed with part cargo under this Clause freight in any case be payable on the quantity delivered.
(4) If at the time the Master elects to proceed with part or full cargo under Clause 3, or after the Vessel has left the loading port, or

## PART II
### "Gencon" Charter (As Revised 1922 and 1976)
Including "F.I.O." Alternative, etc.

last of the loading ports, if more than one, it appears that further performance of the contract will subject the Vessel, her Master and crew or her cargo, to war risks, the cargo shall be discharged, or if the discharge has been commenced shall be completed, at any safe port in vicinity of the port of discharge as may be ordered by the Charterers. If no such orders shall be received from the Charterers within 48 hours after the Owners have despatched a request by telegram to the Charterers for the nomination of a substitute discharging port, the Owners shall be at liberty to discharge the cargo at any safe port which they may, in their discretion, decide on and such discharge shall be deemed to be due fulfilment of the contract of affreightment. In the event of cargo being discharged at any such other port, the Owners shall be entitled to freight as if the discharge had been effected at the port or ports named in the Bill(s) of Lading or to which the Vessel may have been ordered pursuant thereto.

(5) (a) The Vessel shall have liberty to comply with any directions or recommendations as to loading, departure, arrival, routes, ports of call, stoppages, destination, zones, waters, discharge, delivery or in any other wise whatsoever (including any direction or recommendation not to go to the port of destination or to delay proceeding thereto or to proceed to some other port) given by any Government or by any belligerent or by any organized body engaged in civil war, hostilities or warlike operations or by any person or body acting or purporting to act as or with the authority of any Government or belligerent or of any such organized body or by any committee or person having under the terms of the war risks insurance on the Vessel, the right to give any such directions or recommendations. If, by reason of or in compliance with any such direction or recommendation, anything is done or is not done, such shall not be deemed a deviation.

(b) If, by reason of or in compliance with any such directions or recommendations, the Vessel does not proceed to the port or ports named in the Bill(s) of Lading or to which she may have been ordered pursuant thereto, the Vessel may proceed to any port as directed or recommended or to any safe port which the Owners in their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfilment of the contract of affreightment and the Owners shall be entitled to freight as if discharge had been effected at the port or ports named in the Bill(s) of Lading or to which the Vessel may have been ordered pursuant thereto.

(6) All extra expenses (including insurance costs) involved in discharging cargo at the loading port or in reaching or discharging the cargo at any port as provided in Clauses 4 and 5 (b) hereof shall be paid by the Charterers and/or cargo owners, and the Owners shall have a lien on the cargo for all moneys due under these Clauses.

17. GENERAL ICE CLAUSE
*Port of loading*

(a) In the event of the loading port being inaccessible by reason of ice when vessel is ready to proceed from her last port or at any time during the voyage or on vessel's arrival or in case frost sets in after vessel's arrival, the Captain for fear of being frozen in is at liberty to leave without cargo, and this Charter shall be null and void.

(b) If during loading the Captain, for fear of vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter to be forwarded to destination at vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Receivers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per Charter.

(c) In case of more than one loading port, and if one or more of the ports are closed by ice, the Captain or Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under section (b) or to declare the Charter null and void unless Charterers agree to load full cargo at the open port.

(d) This Ice Clause not to apply in the Spring.

*Port of discharge*

(a) Should ice (except in the Spring) prevent vessel from reaching port of discharge Receivers shall have the option of keeping vessel waiting until the reopening of navigation and paying demurrage, or of ordering the vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after Captain or Owners have given notice to Charterers of the impossibility of reaching port of destination.

(b) If during discharging the Captain for fear of vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge.

(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.



# R I D E R
## TO THE CHARTER PARTY M/V VASILIY BURKHANOV DD 23.07.2003

### CL 18 EXTRA INSURANCE
Any extra insurance on cargo on account of vessel's age/ a Liner Certificate to be for Charterers' account.

### CL 19 TIME COUNTING
Laytime for loading and discharging shall commence at 2 pm if Notice of Readiness is given before noon, and at 8 am next working day if Notice of Readiness given during office hours after noon. Time actually used before commencement of laytime to count half. Time lost in waiting for berth to count as laytime.
Time at subsequent loading and discharging port(s) to start to count on vessel's arrival if during office hours otherwise from first resumption of work. Notice of Readiness to be tendered during office hours by Owners/Master by telex/cable/fax and when vessel is in all respect ready to load the cargo. Notice may be tendered whether in port or not, whether in berth or not, whether custom cleared or not, whether in free pratique or not.
If after berthing the vessel is found not to be ready in all respects to load, Notice of Readiness will not be valid and time will start to count when the vessel has in fact passed independent survey and is in all respects ready to commence loading.

At first discharging port time to start to count at 2 pm if Notice of Readiness has been tendered before noon or at 8 am next working day if Notice of Readiness has been tendered after noon.

Time actually used before commencement of laytime to count half.

### CL 20 SECOND BERTH
deleted

### CL 21 NOTICE FOR LOADING
Master/ Owners to cable to" Penavico" at first (or sole) loading port, "Minespan Lausanne" tlx 454311 and " Orca Hamburg" tlx 210265 giving 7 days approximate notice plus 3/2/1 days definite notice of ETA at first (or sole) loading port.
On sailing from first loading port master /Owners to cable to "Minespan Lausanne" tlx 454311 and Agents at subsequent loading port (s) giving ETA there.

### CL 22 NOTICE FOR DISCHARGE
On sailing from last loading port Master to cable "Minespan Lausanne"' tlx 454311 ,"Orca Hamburg" tlx 210265, and Agents at first or sole discharging port, if already declared, date and hour of departure, quantity of cargo loaded hold by hold, Bills of Lading date and ETA D/P. Master also to cable "Minespan Lausanne", "Orca Hamburg" and Agents at first or sole discharging port, if already declared, giving 10/7/5 days approximate and 3/2/1 days notice ETA at first or sole discharging port. On sailing from first discharging port master to cable " Minespan Lausanne" and Agents at subsequent discharging port giving ETA there.



# RIDER
## TO THE CHARTER PARTY M/V VASILIY BURKHANOV DD 23.07.2003

Page 2

### CL. 23 LOADING AND DISCHARGING RATE (see also CL. 5)
Loading:   8 weather working days of 24 consecutive hours Sundays Holidays excluded even if used - Saturday noon/Monday 8 am.
Discharge: 10 weather working days of 24 consecutive hours Saturdays Sundays Holidays excluded even if used - Friday 5 pm / Monday 8 am.

Laytime between loading and discharging ports to be non reversible but time between loading ports and time between discharging ports to be reversible.

### CL. 24 DESPATCH
Despatch money to be half the demurrage rate calculated on working time saved at both ends.

### CL. 25 RESPONSIBILITY
Master not to sign Bill(s) of Lading or Mate's Receipt for quantities which according to the best of his knowledge and vessel's draft/calculation table, have or seem to have not been loaded.

It's herewith agreed that should the cargo being presented for loading to the vessel under this Charter not to be of good quality/condition when presented to the Master for loading, for example if bagged cargo torn or damaged or not in compliance to enable issuing Clean on Board Bills of Lading, Master is obliged to reject such cargo and request Shippers to supply good, sound, clean cargo to enable the Master to sign Clean on Board Bills of Lading.
Charterers not to accept comments on Mates' Receipts such as 'quantity unknown'. Should conditional pre-loading cargo Survey be required, a recognised P&I Club Surveyor to be appointed to carry out such survey and costs to be for Owners' account

### CL. 26 STEVEDORES
Both at loading and discharging ports Stevedores although appointed by Charterers or their Agents are under direction and the responsibility of the Master and Charterers will assist Owners in recovering any claim for Stevedore damage(s).

### CL. 27 AGENTS
Owners to appoint agents nominated by Charterers at the loading (Penavico) and discharging (Nakkas) ports.
Owners to put loading and discharging port Agents in funds before vessel's arrival.

### CL. 28 ARBITRATION
All disputes from the time to time arising out of this Contract shall be amicably settled by both parties discussing in good faith. In case of no amicable settlement reached, disputes shall be referred to Arbitration in London and English Law to apply.



R I D E R
TO THE CHARTER PARTY M/V VASILIY BURKHANOV DD 23.07.2003

Page 3

## CL 29 DERRICK/CRANES
If required by the Charterers/Shippers/Receivers vessel to give free use of cranes /derricks in good working order and power to drive same as on board for night work free of expenses to the Charterers, Shippers, Receivers. In case of winches and /or derricks and/or power failure laytime not to count prorata to the number of workable hatches affected.

## CL 30 DISCHARGE
No cargo to be loaded in deeptanks nor in bridge spaces, nor in any other places not accessible for discharge. Should nevertheless any cargo be loaded by vessel in places not accessible to discharge means, any time and/or despatch money so lost and all extra expenses over and above the cost of normal discharge at port of destination to be for Owners' account.

## CL 31 FREIGHT PAYMENT
Freight deemed earned on completion of loading, discountless and non returnable ship and or cargo lost or not lost.
Freight is payable 98 % within 3 banking days after completion of loading and upon signing and releasing of Clean on Board Bill(s) of Lading marked "FREIGHT PAYABLE AS PER CHARTER PARTY".
Should Charterers require Bill(s) of Lading marked " FREIGHT PREPAID" then Bs/L to be released only upon receiving 98% Freight into Owners' bank account.

Charterers are entitled to deduct from freight address commission and brokerage agreed upon. Undisputed demurrage/despatch to be settled within 20 days after completion of discharging and receipt of Owners' final freight account, time sheet, statement of facts and copy of NOR of all ports.

Charterers to follow Shipowners' telex instructions without any responsibility for the Charterers for remitting freight to another party than Shipowners directly.

## CL 32 OVERTIME
Overtime to be for account of the Party ordering same . If ordered by Port Authority, overtime to be for Charterers' account, but Crew's and Officers' overtime to be always for Owners' account.

## CL 33 FUMIGATION
Charterers have the right to fumigate the cargo on board the vessel in their time and at their expense. Fumigation to be done during daytime in port of loading and/or discharging only. If fumigation time exceeds 4hours Charterers to organise crew accommodation and meal and transportation from/to hotel for their account. A safe accommodation of crew on board during fumigation always at Master's discretion. Master to be presented Charterers' Surveyor Certificate and Instruction Sheet.





### RIDER
### TO THE CHARTER PARTY M/V VASILIY BURKHANOV DD 23.07.2003

Page 4

**CL 34 TAXES**
Taxes on cargo to be for Charterers' account, on vessel, freight and flag to be for Owners' account. Turkish freight tax, if any, to be for Charterers' account.

**CL 35 BILLS OF LADING**
Discharge port(s) shown in Bill(s) of Lading not to constitute a declaration of discharge port and Charterers to have the right to order the vessel at any port within the terms of the Charter Party. Charterers hereby indemnify Owners against claims brought by holder of Bill(s) of Lading against Owners by reason of change of destination.
In case Bill(s) of Lading cannot be produced at port of discharge Owners to allow discharging against Charterers' Letter of Indemnity signed by Charterers.

**CL 36 TRIMMING**
The cargo to be loaded, stowed, trimmed and discharged free of risk and expenses to the vessel. Trimming to be done according to Master's reasonable satisfaction. Extra trimming if required to be for account of the party ordering same, vessel to remain in seaworthy trim upto Master's satisfaction between load and discharge ports.

**CL 37 HEAT SOURCE PROTECTION**
If to conform to local regulations cargo is to be loaded without being in contact with the bulkhead of engine room, the owners to construct a wooden bulkhead between cargo and engine room bulkhead at their time and expense.

**CL 38 P & I**
Owners warrant the vessel is entered with P&I Club and will remain so during the currency of this Charter Party.

**CL 39 GOVERNING LAWS AND PROTECTIVES**
This Charter Party to be governed by English Law. New Both to Blame Collision Clause, New Jason Clause, Chamber of Shipping War Risk Clauses 1 and 2, P and I Bunkering Clause, and PARAMOUNT Clause are deemed to be incorporated in this Charter Party.

**CL 40 SECRECY**
This fixture to be kept private and confidential.

13/08 '03 MI 19:06 FAX 49 40 37869550    ORCA TRANSPORT AGENCY



# RIDER
## TO THE CHARTER PARTY M/V VASILIY BURKHANOV DD 23.07.2003

Page 5

**CL 41 VESSEL'S DESCRIPTION**
- MV VASILIY BURKHANOV
MULTI PURPOSE TYPE ABLE TRADE AS SINGLEDECKER WITH TWEENDECKS HOISTED
DWT/GRT/NRT: 22910/18627/7669/ MT ON 11.34 M SSW
LOA/BM: 177.20/24.50 M
BL/GR CAPA (CBM): 27779/30578: HO/HA 5/8 : FLAG/CREW RUSSIAN:
CALL SIGN: UQDB: BUILT 1986 AT TURKU SHIPYARD,FINLAND
SPEED/CONSUMP:
1 ME -12.0/12.6 KNTS L/B ON 27.0 180 ÷ 3.4D
IN PORT WITH CGO OPS: 2.0 MT IFO180/RME25 + 4.0 MT MDO/DMC
          W/O CGO OPS: 2.0 MT      2.3 MT
FOR MANOEUVRE: KG/HR 2 ME-1000MT MDO:1 ME - 500 MT MDO
+ 5PCT GAS/DMA OF IFO CONSUMED FOR ME, SHAFT GEN AND
EMERGENCY GEN

VESSEL IS DRYCARGO-CARRIER, MULTIPURPOSE PLUS RORO
CLASS OF RUSSIAN REGISTER - KM ULA 2 A2,
EQUAL TO LLOYDS HIGHEST CLASS,
HIGHEST ICE CLASS ULA  AS PER RUSSIAN REGISTER
EQUAL HIGHEST LLOYDS
H UPTO UPPERDECK-15.2 M; H -HIGHEST -51.5 M,
T-INBALLAST -1.21/7.48M
GRT/NRT-18627/7669, SUEZ - NET 15537.31,
PANAMA - NET 12927.57
CARGO GEAR: H NRS 1,4,5 - 1 X 20 T EACH,
 H NRS 2, 3 - 1 X 40 T EACH
CAN WORK TWIN(USING SPREADER) 80 T AND SERVES
 BOTH HATCHES NR 2,3

VESSEL ABLE TO HV ON BOARD-2100 IFO,MDO-400T,LUB-185,
FRESH WATER -455,BALLAST - 6972T

CARGO ACCOMMODATIONS
| NAME | CAPA GR/BALE | SIZE L X B X H | SQ.M | STRENGTH |
|---|---|---|---|---|
| LH 1 | 977.6/748.0 CBM | 11.2X15.6X5.32 | 148.9 | 6.8 T/SQ.M |
| LH 2 | 3657.2/3484.3 | 24.0X18.6X8.7 | 403.3 | 10.0 |
| LH 3 | 4256.9/4061.6 | 27.2X18.6X8.7 | 505.9 | 10.0 |
| LH 4 | 3255.2/3105.8 | 20.8X18.6X8.7 | 386.8 | 10.0 |
| LH 5 | 901.8/701.8 | 11.2X18.6X4.5 | 182.5 | 2.0 |
| TTL | 13048.7/12101.5 | | | |

13/08 '03 MI  19:07 FAX 49 40 37869550        ORCA TRANSPORT AGENCY



R I D E R
TO THE CHARTER PARTY M/V VASILIY BURKHANOV DD 23.07.2003

Page 6

```
TW 1  2799.4/2553.2    19.2X22.5X9.76  359.0  4.0
TW 2  3793.3/3413.4    27.2X24.5X6.4   666.4  4.0
TW 3  4760.5/4307.8    33.6X24.5X6.4   823.2  4.0
TW 4  3430.6/3009.6    24.0X24.5X6.4   588.0  4.0
TW 5  2746.1/2394.4    21.6X21.2X7.68  417.9  4.0
TTL  17529.9/15678.4
G.TTL 30578.6/27779.9
```

```
HATCH 1 L X B      12.8 X 13.0    166.4    1.75
HATCH 2 "-"        2 X 19.2 X 8.0  307.2   1.75
HATCH 3 "-"        2 X 25.6 X 8.0  409.6   1.75
HATCH 4 "-"        2 X 19.2 X 8.0  307.2   1.75
HATCH 5 "-"          6.4 X 10.5     67.2   1.75
```

VSL ABLE TO LOAD RORO CGOES IN TWS 2,3,4,5
VIA AFT RAMP(APPAREL)
SIZE OF WHICH L -18 M,B- 5.0 M, WIDE OF ENTRANCE -4.6 M HIGH -4.6 M
STRENGTH -4 T/SQ.M. TW2-2282 SQ M  TW3-2846 TW4-2126
TW5-2200 TTL-9454 SQ M
CO-2 FITTED,
VENTILATION IN HOLDS - 10 TIMES/HR
P AND I - UK CLUB P AND I, RUSSIAN REGISTER
=all details about=

### CL 43  I.S.M. C/P CLAUSE
From the date of coming into force of the International Safety Management (ISM) code in relation to the vessel and thereafter during the currency of this charter Party, the owners shall procure that both the vessel and "The Company"(as defined by the ISM code) shall comply with the requirements of the ISM code.
Upon request the Owners shall provide a copy of relevant document of compliance (DOC) and safety management certificate (SMC) to the Charterers.
Except as otherwise provided in this Charter Party, loss, damage, expenses or delay caused by the failure on the part of the Owners or "The Company" to comply with the ISM code shall be for Owners' account.

### CL 44 DUNNAGE
Dunnage as on board to be at Charterers' disposal free of charge.

### CL 45 TALLY
Shoreside tally to be for Charterers' account, shipside tally for Owners' account.
*******